# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

JAHMYLL WILDER,

      Plaintiff,                             Case No. 13-C-0018

      v.

CALVIN SMITH,

      Defendant.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Plaintiff Jahmyll Wilder, currently an inmate at Green Bay Correctional Institution filed this pro se civil rights action pursuant to 42 U.S.C. § 1983 against Calvin Smith, a Correctional Officer at the Milwaukee House of Corrections. Wilder alleged that Smith subjected him to cruel and unusual punishment in violation of the Eighth Amendment on September 4, 2012, while Wilder was serving a sentence at the House of Corrections for the crimes of entry into a locked vehicle and criminal damage to property. More specifically, Wilder alleged that Smith threw him to the floor of the Booking Room at the facility and proceeded to choke him.

Upon concluding that the case could not be resolved on motions, I recruited counsel for the limited purpose of assisting Wilder at trial. Attorneys Kelly J. Noyes, supervised by Attorney Beth J. Kushner, from the law firm of von Briesen & Roper, S.C., accepted the Court's request. Principal Assistant Corporation Counsel Lee R. Jones represented C.O. Smith. The case was then scheduled for a one-day jury trial to commence on October 1, 2014. On September 24, 2013, the parties stipulated to a trial to the Court. The trial was held as scheduled.

Like all trials, the parties gave conflicting versions of what had occurred in the course of and leading up to the September 4, 2012 incident that forms the basis of the plaintiff's case. Having listened carefully to the witnesses and reviewed the exhibits, I find that Wilder's version is more credible than C.O. Smith's. I base this finding upon the fact that Wilder has been consistent about the essential facts from the beginning. He has also been honest about his own misconduct that appears to have provoked C.O. Smith into acting as he did. His account is to some extent corroborated by the two inmate witnesses, neither of whom had any relationship with him beyond the brief period of time they were confined together. Inmate Devin'a Irby, in particular, appeared credible, acknowledging Wilder's faults and limiting his testimony to only what he saw. Irby knew Wilder only from the House of Correction and was due to be released from Kettle Moraine Correctional Institution in about a month, yet felt a need to testify about conduct he thought was wrong. Inmate Eddie Lee Williams had not interacted with Wilder at all and had only a vague recollection of what occurred. Yet, his recollection supported Wilder's version more than C.O. Smith's. Wilder's claim was also corroborated by the jail records showing that he sought medical attention and pain medication for his back in the two weeks after the incident and requested a bottom bunk. (Ex. 13.) It also seemed more reasonable in light of all the evidence.

C.O. Smith's version, on the other hand, has evolved. He also had to be ordered to provide meaningful answers to discovery requests, and even after being ordered to do so, still failed to respond fully and completely. At trial, C.O. Smith testified that Wilder had stepped on his foot after he had allegedly ordered Wilder to keep his distance. However, in the two reports he had written concerning the incident shortly after it occurred, C.O. Smith did not mention this important fact at all. The first time he made this allegation was after the court ordered him to supplement his answers

to Wilder's interrogatories more than a year-and-a-half after the incident occurred. C.O. Smith also denied Wilder's assertion that he had drawn an imaginary line with his foot and invited Wilder to cross it if he wanted to see what would happen. Yet he stated in his earliest account of the incident that he warned Wilder what would happen "if he approaches me or crosses the line into my personal space." (Ex. 6.) Although C.O. Smith's version was corroborated by C.O. Brian Anderson, Anderson had little recollection of the details and he appeared eager to help his fellow C.O. C.O. Smith's account also fails to reasonably account for Wilder's back injury.

Based on this general assessment of the credibility of the witnesses, I make the following findings of fact.

## FINDINGS OF FACT

1. Plaintiff Jahmyll Wilder was an inmate of the Milwaukee House of Correction (MHOC) serving a sentence for the crimes of entry into locked vehicle and criminal damage to property in September 2012. He was twenty-one years old.

2. Defendant Calvin Smith was a Correctional Officer (C.O.) working at the MHOC in September 2012.

3. In September 2012, Wilder was five feet, eight inches tall and weighed approximately 150 pounds.

4. In September 2012, C.O. Smith was six feet, four inches tall and weighed approximately 245 pounds.

5. On September 3, 2012, a female C.O. came to Wilder's dorm at MHOC to take him to a conference room for a visit with his attorney. The C.O. said she needed another C.O. to accompany them. Wilder saw C.O. Smith in the hallway and, thinking that the female C.O. was going to ask him to help with the escort, said "not dude square ass." C.O. Smith heard Wilder's comment, and approached him saying "What did you say?" Wilder backed off and the other C.O. calmed C.O. Smith down.

6.     The following day, on September 4, 2012, Wilder was transported to the Milwaukee County Courthouse to attend proceedings in another case pending against him. After the court proceedings were completed, Wilder was transported back to the MHOC on a bus with the other inmates who had been taken to court that day or otherwise ordered into custody at MHOC.

7.     Upon arrival at MHOC, the inmates were taken to the booking room where they waited to have their shackles removed and new arrivals were processed and assigned placement. As the bus drove up to MHOC, Inmate Irby who was seated next to Wilder saw C.O. Smith and warned Wilder to avoid contact with him because Irby believed C.O. Smith did not like Wilder.

8.     The Booking Room at MHOC has two rows of ten concrete benches where inmates sit while they wait their turn to have their shackles removed before being escorted to their dormitory or cell. Between thirty and forty inmates entered the Booking Room with Wilder when he returned from court on September 4, 2012. Also present were two C.O.s, one of whom was Smith and the other C.O. Brian Anderson. Also present were four civilian employees of the private contractor that provided the transport service, who are referred to as G4 Officers.

9.     As Wilder was called up to have his shackles removed, C.O. Smith walked past him and bumped into him, causing Wilder to stumble slightly. Wilder said to C.O. Smith, "Wait till I get my cuffs off."

10.    After Wilder's restraints were removed, he approached C.O. Smith and said "Why you bumping me and shit?" C.O. Smith drew an imaginary line directly in front of himself with his foot and said, "Cross this line and I'll show you." Wilder stepped forward across the imaginary line C.O. Smith had drawn.

11.    C.O. Smith immediately grabbed Wilder, wrapping his arms around him, and threw him to the floor. Wilder landed on his back, and C.O. Smith got on top of him, straddling Wilder with his knees and choking him with his hands. Wilder struggled to get free, and C.O. Smith released his grip on Wilder's neck and put his taser against Wilder's chest. C.O. Smith said, "I should taze your ass," and Wilder replied, "Do it." C.O. Smith then raised his fist and threatened to hit Wilder in the face, and Wilder again replied, "Do it."

12.    By that time, C.O. Anderson had arrived, and Wilder was turned onto his stomach and his hands were cuffed behind his back. He was then stood up and escorted to a nearby holding cell.

13.    Wilder felt no pain at the time he landed on the floor or immediately thereafter. He was asked several times if he was hurt or needed to see medical staff. He said he was fine and refused the offer of medical treatment. He had a slight half-inch scratch on his cheek under one of his eyes, but it healed within a couple of days and gave him no problem. It seems

likely the scratch was caused by rubbing against C.O. Smith's name tag when he picked him up. C.O. Smith's name tag came off during the struggle.

14.     Neither Wilder nor C.O. Smith were disciplined, although C.O. Smith did write a violation report concerning the incident. (Ex. 6.) Wilder was returned to his dormitory approximately fifteen minutes later. He again stated to both C.O. Smith and the Lieutenant that he was fine and not in need of medical attention.

15.     Later that evening, Wilder began to feel back pain. He also noticed a small knot on his back. The following day he went to the MHOC medical and was given some pain medication and muscle relaxants. He had a follow-up visit on September 8, 2012, when he requested a stronger pain medication because the pills he was taking were not working. He went for another follow-up on September 17, 2012, asking that his pain pills be "restarted" and stating that he needed a lower bunk. Wilder was required to pay $20 out of his commissary account for each health care visit. (Ex. 13.)

16.     For two or three weeks, Wilder was unable to work out or play volleyball. After that time, the pain disappeared, and he has sought no further medical care.

17.     Wilder knew he was violating MHOC rules by saying "wait till I get these cuffs off." Wilder also knew he was violating MHOC rules by walking up to C.O. Smith and entering into his "personal space." After the incident, Wilder was embarrassed and mad at C.O. Smith.

18.     C.O. Smith was angry at Wilder for ridiculing him and the disrespect he displayed toward him on September 3 and perhaps even earlier, and most likely intentionally bumped into Wilder in the Booking Room on September 4, 2012.

19.     Wilder reacted to C.O. Smith by threatening to take action once his handcuffs were removed and by approaching C.O. Smith and entering into his personal space. C.O. Smith overreacted to Wilder's threatening words and conduct on September 4, 2012.

20.     Although he may have been angry at Wilder, C.O. Smith acted with some restraint. He did not strike Wilder with his fist or use his taser on him, even though Wilder invited him to do so. He did not kick him with his feet or strike him about the head. While I accept Wilder's testimony that C.O. Smith placed his hands around his neck and choked him, I find he did so very briefly and Wilder did not lose consciousness or suffer any injury as a result. C.O. Smith did not intend to injure Wilder, but felt provoked by him and intended to stop his misconduct. He did not act sadistically or maliciously. Had he done so, Wilder would have suffered far more serious injuries.

# CONCLUSIONS OF LAW

21. To prevail on an Eighth Amendment claim of excessive force under 42 U.S.C. § 1983, a plaintiff must prove by a preponderance of the evidence the following elements:

> a. Defendant used force on Plaintiff;

> b. Defendant intentionally used extreme or excessive cruelty toward Plaintiff for the purpose of harming him, and not in a good faith effort to maintain or restore security or discipline;

> c. Defendant's conduct caused harm to Plaintiff;

> d. Defendant acted under color of law.

22. In deciding whether Plaintiff has proved that Defendant intentionally used extreme or excessive cruelty toward Plaintiff, I must consider such factors as:

> – the need to use force;
> – the relationship between the need to use force and the amount of force used;
> – the extent of Plaintiff's injury;
> – whether Defendant reasonably believed there was a threat to the safety of staff or prisoners;
> – any efforts made by Defendant to limit the amount of force used.

In using force against a prisoner, officers cannot realistically be expected to consider every contingency or minimize every possible risk. Seventh Circuit Pattern Jury Instruction 7.15–Eighth Amendment: Excessive Force Against Convicted Prisoner—Elements.

23. The central question in a case alleging excessive force in violation of the Eighth Amendment is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992); *see also Fillmore v. Page*, 358 F.3d 496, 503 (7th Cir. 2004). Among the factors that should be considered in determining whether a violation has occurred are: "the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate." *Id.*

24. The fact that a correctional officer fails to act in compliance with policy manual of the institution where he works does not constitute a violation of the Eighth Amendment unless

the violation itself amounts to the cruel and unusual punishment that the Amendment proscribes.

25.   "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause. . . . The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Guitron v. Paul*, 675 F.3d 1044, 1045 (7th Cir. 2012) (internal citations and quotations omitted).

26.   Though I view the case as close, I conclude that C.O. Smith did not violate Wilder's Eighth Amendment rights. The injury to Wilder was by no means *de minimis*. But C.O. Smith did not act "maliciously or sadistically for the very purpose of causing harm." His response to Wilder's disrespect, while improper and a violation of the MHOC policies, was intended to address what he viewed as Wilder's misconduct. Given Wilder's provocation, it does not amount to a violation of the Eighth Amendment.

## CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Clerk is directed to enter judgment in favor of Defendant dismissing Plaintiff's claim on its merits and with prejudice. The Court is grateful for the excellent representation provided by Attorneys Kushner and Noyes.

**SO ORDERED** this  3rd  day of October, 2014.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court